OPINION
Defendant-appellant Jerri Pappas appeals from her conviction and sentence for Contributing to the Unruliness of a Minor. She contends that the trial court erred by basing her conviction, in part, upon her exercise of her rights under the Fourth Amendment to the United States Constitution. She also contends that her conviction is against the manifest weight of the evidence. We find it unnecessary to address Pappas's first contention. Her conviction depended upon circumstantial evidence. There is no direct evidence that the minor was present in Pappas's home when Pappas allegedly refused a police officer's request to search, although there is direct evidence to the contrary. In our view, the inference that the minor was at home at that time is clearly outweighed by the competing inference that she was not. Furthermore, with respect to acts earlier that day, when the minor was present in Pappas's home, proof of the required culpability state — either that Pappas intended to contribute to the unruliness of the minor or that she acted recklessly in that regard — necessarily depends upon circumstantial evidence, the only direct evidence being to the contrary. In our view, the inference that Pappas's acts were either intended to contribute to the minor's unruliness or were reckless in that regard is clearly outweighed by the inference that Pappas reasonably believed that her course of conduct would serve to ameliorate, rather than contribute to, the minor's unruliness.
Because we conclude that Pappas's conviction is against the manifest weight of the evidence, and that the correct judgment in this case is a judgment of acquittal, the judgment of the trial court is Reversed, and Pappas is Discharged.
 I
At the time of these events, Pappas was a nineteen-year-old woman living with her seven-month-old baby and her paraplegic mother. The minor, Allison Sparaco, was a sixteen-year-old girl who lived with her brother and her mother, Charlette Sparaco. Allison and Pappas had met earlier, but became good friends in September, 2000, when Allison helped Pappas move into her apartment.
In January, 2001, Allison's mother, Charlette, became concerned about her daughter's friendship with Pappas. Ms. Sparaco informed both her daughter and Pappas that the two were to have no contact with each other outside of the church to which they both belonged. They could talk together at church, but not at other times or places. Pappas and Allison both testified that they understood Ms. Sparaco's directive.
The actions leading to Pappas's conviction took place on February 14, 2001. Allison left home between 7:00 a.m. and 7:10 a.m. to go to school, which started at 7:40 a.m. Allison was being driven by a fellow student. As a result of a trivial incident involving some loose change, Allison and her friend had an argument. While they were waiting at a red light, Allison got out of the car and told her friend she would walk to school.
It was raining that morning. There was no testimony that it was raining hard, but it appears from all the testimony, including that of at least one police officer, that it was raining steadily, so that a police officer who was out of his cruiser for about five minutes described himself as having got "wet."
Allison walked to Pappas's house, knocking at the door at about 7:20 a.m. or 7:25 a.m. Both Allison and Pappas testified that Pappas did not immediately let Allison in, instead telling Allison that she should go to school. At some point, however, with the argument still in progress, Pappas let Allison in, because she did not want to leave her friend standing in the rain.
Both Pappas and Allison testified that the argument continued. Pappas testified that she told Allison "quite a few times that day" that Allison should go to school, and that Pappas would have taken her, but had no gas for her car.
During the course of the argument, Pappas told Allison that she intended to call Allison's mother. Allison threatened to run if Pappas did that. Pappas testified that she believed that Allison would do exactly that.
Finally, the argument ended with Allison agreeing to go to school as soon as the rain let up, in exchange for Pappas not calling Allison's mother. If the rain did not let up, it was agreed that Allison would go to school at the end of the first period, which Pappas assumed to be some time between 8:15 a.m. and 8:30 a.m. Pappas testified that, based on their previous relationship, she believed Allison would honor this agreement.
Meanwhile, at about 8:00 a.m., Allison's school called her mother, Ms. Sparaco, to report that Allison had not shown up for school. Ms. Sparaco went to Pappas's home, and upon Pappas answering the door, told Pappas that she suspected that Allison was there. Pappas confirmed that Allison was there, let Ms. Sparaco in, and led Ms. Sparaco to Allison, who was hiding between a bed and the wall. Ms. Sparaco testified that Pappas was "very supportive," joining with Ms. Sparaco in telling Allison that she had to go to school.
The pleas of both Pappas and Ms. Sparaco not accomplishing the desired result, Ms. Sparaco asked Pappas for the telephone, in order to call the police. Pappas gave Ms. Sparaco the telephone, and Ms. Sparaco called the police. When the responding officer Ryan Carsey arrived, Pappas and Ms. Sparaco informed him of the situation, and Allison ran out the back door. Sparaco testified that she believed that Allison ran out the back door as Carsey was coming through the front door, which was 9:07 a.m.
There is no indication in the record that Pappas failed in any way to cooperate with Carsey, or for that matter, Ms. Sparaco, at this time. To the contrary, it appears that Pappas was cooperating completely, once Ms. Sparaco knocked on her door.
Allison testified that when she left Pappas's home, she went to the home of Bruce Downing, a deacon at their church. She testified that she remained there until some time after 1:00 p.m. Downing did not testify. Ms. Sparaco testified that she received a call from Downing to the effect that Allison had been at his home, that he tried to convince her to let him take her either back home or to school, but that she had left. Ms. Sparaco testified that she then immediately called the Troy Police Department, as she had been instructed to do, and that this was about 1:30 p.m.
Both Pappas and Allison testified that just before Allison left Downing's home, Allison called Pappas, some time between 1:00 p.m. and 1:30 p.m., and told Pappas that she was going to come over and that Pappas should "do what you have to do." Pappas took this to mean that she should turn Allison in to the police. During this telephone conversation, which was evidently brief, Pappas had told Allison that "there was cops driving by and there was cops around." Allison then told Pappas to do what she had to do, but that Allison was on her way. Then, before Pappas could respond, Allison hung up the phone.
After Ms. Sparaco notified the police of Downing's report that Allison had left his house, two police officers went to Pappas's home. Robert Hartman parked out of view and walked behind the house. He testified that five to ten minutes later, then-Sgt. Charles Adams radioed that he was leaving the scene. (Adams had been promoted to Captain by the time of the trial.) Adams had gone to Pappas's home. He testified that it took him two to three minutes after receiving the report from Ms. Sparaco, who testified that she notified the police immediately after Downing reported that Allison had left his home. Adams testified that he told Pappas that he would like to look through her apartment for Allison, and that she denied him access, during a conversation that lasted from three to four minutes. Although Adams did not directly testify that Pappas had told him that Allison was not there at this time, he did testify that he reported by radio that Pappas had told him that Allison was not there.
Hartman left his position from behind the house when Adams radioed that he was leaving. Hartman walked to the south side of the house, and spoke with Adams. After this conversation, Hartman went to his cruiser, which he had parked out of view, with the intention of leaving the scene. As Hartman was driving up an alley to the street, Pappas came out of her home, saw him, flagged him down, and told him that Allison was in her house now. They went inside, and Hartman took Allison into custody. Hartman testified that it was about two minutes from the time that Pappas told Adams that Allison was not there until the time that Pappas told Hartman that Allison was there. Hartman also testified that while had been posted in the back of the house, no one entered through the back door.
Pappas testified that Allison was not in her home when she talked with Adams, but that after this conversation, she went back into the house, and saw Allison walk through a back room. Pappas told Allison that the police were out there, Allison said "well then, turn me in," and Pappas went outside to find Adams to do that. She did not find Adams, but she saw Hartman, and flagged him down. Allison's testimony essentially corroborates Pappas's testimony in this respect.
When Allison came in the back door of Pappas's home, it was unlocked. Pappas testified that she had no key, and that her habit and practice was to leave the back door unlocked so that she, and the nurses who came to attend her paraplegic mother, would have access. This testimony was unrebutted. Pappas testified that when Allison called her in the early afternoon to say she was coming over, it did not cross Pappas's mind that she should go through the house locking all the doors and windows.
Pappas was charged with Contributing to the Unruliness of a Minor. Following a bench trial, she was convicted and sentenced accordingly. From her conviction and sentence, Pappas appeals.
 II
Pappas's Second Assignment of Error is as follows:
 THE TRIAL COURT'S FINDING MS. PAPPAS GUILTY OF VIOLATING R.C. 2919.24(A)(2) WAS NOT PROVEN BEYOND A REASONABLE DOUBT AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
In its decision, the trial court rendered twenty-seven enumerated findings of fact. The ones of particular relevance to this appeal are the following:
 The Defendant acted in a way tending to cause Allison Sparaco to become an unruly child when she allowed Allison Sparaco to come inside her residence.
 The defendant acted in a way tending to cause Allison Sparaco to become an unruly child when the Defendant allowed Allison Sparaco to watch TV in her residence when Allison Sparaco was supposed to be at school.
 21. On February 14, 2001, after Allison Sparaco had returned to the Defendant's residence and was inside the Defendant's residence, Troy Police officer Charles Adams came to the Defendant's residence and told Defendant that he would look through her "apartment," i.e. residence, for Allison Sparaco.
 22. The Defendant denied Officer Adams access to her residence.
 26. The Defendant acted in a way tending to cause Allison Sparaco to become an unruly child when the Defendant left the back door unlocked so that Allison Sparaco could enter the Defendant's residence, and then allowing Allison Sparaco to return to the residence.
 27. Defendant acted in a way tending to cause Allison Sparaco to become an unruly child by denying Officer Adams access to her residence since she had allowed Officer Carsey access to her residence earlier that day.
When a court of appeals is determining whether a judgment is against the manifest weight of the evidence, it sits as a "thirteenth juror," and determines whether the greater amount of credible evidence weighs against the judgment of the trial court. State v. Thompkins (1997),78 Ohio St.3d 380 at 387. We have held that where the factual issue involves the determination of credibility of conflicting testimony, the factfinder, who sees and hears the testimony, is entitled to substantial deference, but that where the issue is one of resolving competing inferences, as it was in State v. Thompkins, supra, the factfinder is entitled to less deference. State v. Lawson (August 22, 1997), Montgomery App. No. 16288, unreported.
In the case before us, there are two sequences of events upon which the State must rely for the proposition that Pappas is guilty of Contributing to the Unruliness of a Minor. The first of these began when Allison knocked on Pappas's door, between 7:20 a.m. and 7:25 a.m., and ended when the mother arrived shortly after 8:00 a.m. There is no question that Pappas did not call Ms. Sparaco, the school or the police. There is also no question that Allison remained in Pappas's home during this interval, that Pappas knew that Allison was supposed to be in school, and that Pappas also knew that Allison was not supposed to have contact with Pappas outside of church. The State contends, and the trial court found, that by not calling Ms. Sparaco, Pappas was acting "in a way tending to cause [Allison] to become an unruly child," which is prohibited by R.C.2919.24. The State argues, and we agree, that the unruliness involved was Allison's not going to school, and not obeying her mother's prohibition against associating with Pappas.
When a section of the Ohio Revised Code defining a criminal offense neither specifies culpability nor plainly indicates a purpose to impose strict liability, recklessness is sufficient culpability to commit the offense. R.C. 2901.21(B). We find nothing in R.C. 2919.24 that plainly indicates a purpose to impose strict liability. Nor, in our view, would it make sense for this to be a strict liability offense. If it were, for example, then it would not matter whether Pappas knew that Allison had been instructed by her mother not to associate with Pappas. She would be strictly liable for associating with Allison, even if she were ignorant of Allison's mother's instructions in that regard. We doubt that the General Assembly intended to impose criminal liability upon acts befriending a minor under these circumstances.
Because R.C. 2919.24 is not a strict liability offense, and because no particular culpability is specified, recklessness is sufficient culpability. Where recklessness is sufficient, the higher degrees of culpability of purposeful conduct and knowing conduct will also be sufficient. A person acts recklessly when, with heedless indifference to the consequences, she perversely disregards a known risk that her conduct is likely to cause a certain result or is likely to be of a certain nature. R.C. 2901.22(C).
In the case before us, there is no direct evidence that Pappas intended to contribute to Allison's unruliness. Her own testimony is to the contrary. She testified that she was trying to bring about Allison's going to school that morning, and that her agreement with Allison was intended to bring about that result.
Pappas testified that Allison had threatened to run if Pappas called her mother, and that Pappas believed that Allison would do so. Subsequent events corroborated Pappas's belief. When Allison's mother arrived, she and Pappas both tried to get Allison to go to school, but Allison fled.
The conclusion that Pappas reached her agreement with Allison with the intention of supporting or reinforcing Allison's unruly behavior, or with heedless indifference to that possibility, requires an inference from the facts directly in evidence that, in our view, is not credible. In our view, the competing inference that Pappas was attempting to ameliorate Allison's unruly behavior in refusing to go to school or to communicate with her mother is clearly of greater weight. It is consistent with the direct testimony of Pappas and Allison concerning events before the arrival of Allison's mother, and it is also consistent with Pappas's instant and full cooperation once Allison's mother arrived.
The second event upon which the State relies concerns Allison's return to Pappas's residence later that day, and Pappas's denial of Allison's presence to police officer Adams that afternoon. The trial court expressly found that Allison was present in Pappas's home when Pappas told officer Adams that Allison was not there. The only direct evidence is to the contrary, Pappas having testified that she only saw Allison in her home when she went back inside after concluding her conversation with Adams, and that she then went running outside to look for Adams, finding Hartman instead, and immediately telling Hartman that Allison was present. There is no testimony directly contradicting this. It is consistent with Allison's testimony.
Although Hartman testified that he had been stationed in the back of the house and had not seen Allison return to the home, he also testified that he left his position behind the house to go talk to Adams when Adams radioed that he was leaving the house. Thus, Hartman would not have been in a position to see Allison entering the home during the very time that Allison and Pappas testified that Allison did so.
In our view, it makes little sense to infer that Pappas knew that Allison was in the home when Pappas talked with Adams, since, by all accounts, she went outside looking for Adams, and finding Hartman, about two minutes later, to report Allison's presence. If, during her conversation with Adams, Pappas had the intention of harboring Allison as a fugitive, it seems unlikely that her intention would change, just two minutes later, to the extent that Pappas would go looking for the very same officer to report Allison's presence.
Based upon our review of the entire transcript of the trial testimony, we conclude that the trial court's finding that Pappas knew that Allison was present in her home when Pappas told Adams, to the contrary, that Allison was not there, is against the manifest weight of the evidence. Without that finding, the afternoon event is completely benign. Pappas reported Allison's presence in her home to the police promptly upon becoming aware of it.
The State would argue that the mere fact that Pappas left her back door unlocked after Allison told Pappas that she would be coming over, is an act contributing to Allison's unruliness. We find this unpersuasive. Pappas's unrebutted testimony was that it never entered her mind that she should lock the doors and windows to prevent Allison from entering her home. More importantly, the course she actually took — permitting that access but then promptly reporting Allison's presence to the police — was better calculated to put an end to Allison's unruly behavior. Had Allison been unable to enter by the back door, she might well have left the scene and continued to evade the authorities who were looking for her.
In short, we conclude that the judgment of the trial court is against the manifest weight of the evidence, and Pappas's Second Assignment of Error is sustained.
 III
Pappas's First Assignment of Error is as follows:
 THE TRIAL COURT ERRED WHEN IT IMPROPERLY USED MS. PAPPAS' EXERCISE OF HER FOURTH AMENDMENT RIGHT TO BE FREE FROM UNREASONABLE SEARCHES, TO CONVICT HER OF VIOLATING R.C. 2919.24(A)(2).
In view of our disposition of Pappas's Second Assignment of Error, we find it unnecessary to resolve her First Assignment of Error. Accordingly, Pappas's First Assignment of Error is overruled, as moot.
 IV
Pappas's Second Assignment of Error having been sustained, the judgment of the trial court is Reversed, and Pappas is Discharged with respect to the offense of which she was convicted and sentenced.
WOLFF, P.J., and BROGAN, J., concur.